## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JANE DOE,<br><br>     Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security;<br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES;<br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;<br>RONALD D. VITIELLO, Deputy Director and Acting Director, U.S. Immigration and Customs Enforcement;<br>MATTHEW T. ALBENCE, Executive Associate Director for Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement;<br>BRIAN MANNING, Asylum Officer, U.S. Immigration and Customs Enforcement;<br>U.S. CUSTOMS AND BORDER PROTECTION;<br>JOHN DOES, Officers and Employees of U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services;<br>JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, all in their official capacities,<br><br>     Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§      CIVIL ACTION NO. _____ |

## PETITION FOR HABEAS CORPUS AND
## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

# INTRODUCTION

1. In June 2018, Plaintiff Jane Doe[1] ("Plaintiff") traveled to the United States with her 12-year old daughter, "A.M.," in an effort to escape (1) grievous, repeated violence visited upon Plaintiff by an individual closely associated with a Honduran police force, and (2) persistent threats of violence and death made against Plaintiff and her daughter by a powerful gang that is connected to and protected by officials in the Honduran government and police force.

2. Shortly after crossing the border into the United States, Plaintiff and A.M. were apprehended and detained by the U.S. Customs and Border Protection ("CBP"), who subsequently turned them over to U.S. Immigration and Customs Enforcement ("ICE"). Thereafter, in accordance with the policies, practices, and statements of the White House and the

---

[1] Plaintiff requests that this Court permit her to proceed pseudonymously in light of the risk to her personal safety that would result from the disclosure of her true identity. Although parties to a lawsuit are generally required to proceed under their real names, *see* Fed. R. Civ. P. 10(a), parties have been permitted to proceed under fictitious names where the circumstances warrant a departure from this general rule. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973); *Doe v. Deschamps*, 64 F.R.D. 652, 653 (D. Mont. 1974). It is within the court's discretion to allow a plaintiff to sue pseudonymously. *Doe v. Hallock*, 119 F.R.D. 640 (S.D. Miss. 1987); *see Doe v. BlueCross & Blue Shield of Rhode Island*, 794 F. Supp. 72 (D.R.I. 1992). "The decision [as to whether a party may sue anonymously] requires a balancing of considerations calling for maintenance of a party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981) (permitting plaintiffs to proceed anonymously in light of threats and hostility to plaintiffs). Courts have carved out an exception to the rule requiring public disclosure where the parties have a strong interest in proceeding anonymously. *Doe v. Blue Cross & Blue Shield of Rhode Island*, 794 F. Supp. 72 (D.R.I. 1992). Cases of this type commonly involve "abortion, mental illness, *personal safety*, homosexuality, transsexuality and illegitimate or abandoned children in welfare cases." *Id.* at 74 (emphasis added). These cases usually involve "the presence of some social stigma or the threat of physical harm to the plaintiffs attaching to disclosure of their identities to the public record." *Id.* Here, Plaintiff fears retribution from her ex-boyfriend and the gangs that caused her to flee Honduras should they become aware that she is bringing this action. In light of the credible and serious threats to her life and the life and wellbeing of her daughter, Plaintiff requests that she be allowed to proceed under the pseudonym Jane Doe.

current administration, the U.S. Attorney General, the Department of Homeland Security ("DHS"), and ICE, Defendants forcibly separated Plaintiff from A.M., who is now being kept in a children's detention facility in Florida. As of the date hereof, Plaintiff has been separated from her minor daughter for nearly one month. This ongoing, forced separation has been and continues to be extremely distressing and traumatizing to Plaintiff and her daughter.

3.      Throughout this entire process, Plaintiff's chief concern has been to reunite with her daughter and to ensure her daughter's safety. During her detention, Defendants have played upon this fear, repeatedly taunting Plaintiff about her daughter's whereabouts and her ability to be reunited with A.M. Agents even threatened to deport *her while keeping A.M. in the United States* as punishment for crossing the border "illegally"—despite the fact that ICE has been enjoined from doing so by a United States District Court. *See Ms. L. v. U.S. Immigration & Customs Enforcement*, No. 18-cv-0428 DMS (MDD), Order Granting Plaintiffs' Motion for Classwide Preliminary Injunction, dated June 26, 2018.

4.      ICE guards have also been verbally abusive to Plaintiff, repeatedly yelling at her and trying to humiliate her.

5.      Plaintiff's daughter has fared no better. In fact, the separation has been so detrimental to A.M. that she has been inconsolable, leading her social worker and custodian to engage a therapist to try to help ameliorate short- and long-term impacts of her obvious trauma.

6.      Shortly after being detained, Plaintiff expressed a fear of returning to Honduras. In response, she was granted a credible fear interview with Defendant Manning, an Asylum Officer. However, the interview was substantively and procedurally deficient. Among other things, Plaintiff did not receive an adequate explanation of the proceedings and did not fully understand their import. Additionally, the written record of the interview reveals a sloppy,

incomplete process during which Plaintiff was prevented from fully explaining her case—including the crucial fact that her tormentors are closely tied to Honduran government and police officials, and that they can and have abused her and threatened her and A.M. with impunity. Additionally, Defendant Manning repeatedly mischaracterized Plaintiff's answers and recorded them improperly.

7.      As a result of this patently deficient interview, Defendant Manning improperly and incorrectly determined that Plaintiff was ineligible for asylum because she had no credible fear of a cognizable harm in Honduras that would warrant relief under federal asylum laws.

8.      Defendant Manning asked Plaintiff over the phone to waive her right to have this determination reviewed by an immigration judge. Plaintiff did not understand the ramifications of his question and, in light of the harrowing experiences surrounding her detention and the devastating impact of the forced separation on her daughter, she orally indicated that she did not intend to appeal. At the time, she believed that it was the only way she could ensure that she would be timely reunited with her daughter.

9.      However, when she returned to the detention center and other detainees explained that a waiver of review by an immigration judge could lead to her removal without further process, she immediately wrote a letter in which she requested that an immigration judge review her eligibility for asylum, including the negative credible fear finding (the "IJ Request"). Plaintiff put the IJ Request in an envelope addressed to "ICE" and, at the direction of ICE guards, placed the envelope in an onsite mailbox for ICE.

10.     A day or so after Plaintiff made the IJ request to Defendant John Doe, Defendant John Doe, an ICE Officer at Port Isabel Detention Center ("PIDC"), approached Plaintiff with a piece of paper (now known to be the Record of Negative Credible Fear Finding and Request for

Review by Immigration Judge Form) and instructed her to check a box and sign the document, threatening to report her if she did not do so.

11.     Plaintiff, exhausted by her detainment, intimidated by the actions of the Defendants and the other ICE Officers, terrified by her long-term traumatic harm caused by the involuntary separation from her daughter, and without understanding what she was being instructed to do, signed the English-language document (which she could not read) that purported to waive her rights to have an immigration judge review the negative credible fear finding.

12.     Since then, ICE Officers have indicated that they are coordinating with the Honduran consulate to arrange for the immediate removal of Plaintiff and her daughter. They have indicated that they will not honor Plaintiff's IJ Request because she signed a form that purports to waive the right to review by the immigration judge, despite the fact that Defendants know that Plaintiff signed the form under duress and without understanding the import of—or even the words in—the document.

13.     Once Plaintiff engaged counsel, counsel also wrote two letters and left multiple messages for ICE officials reiterating Plaintiff's request for IJ review.  Despite these efforts, Plaintiff's counsel has received no response.

14.     Defendants' actions, including repeated intimidation tactics and the unlawful separation of Plaintiff from her daughter, have deprived Plaintiff of her right to Due Process, as well as her statutory rights to make an asylum claim in the face of persecution.

15.     Defendants' actions were also in violation of the APA and established common law rights available to Plaintiff.

16. The threatened imminent removal of Plaintiff and her daughter requires immediate injunctive relief. She is likely to succeed on the merits of her claims and, in the absence of injunctive relief, she would suffer irreparable harm should she be removed. Furthermore, the balance of the equities tip in favor of granting the requested injunction, and granting the injunction is in the public interest.

## JURISDICTION AND VENUE

17. This case arises under the First and Fifth Amendments to the United States Constitution, federal asylum statutes, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701.

18. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (habeas jurisdiction); and Art. I., § 9, Cl. 2 of the United States Constitution ("Suspension Clause"). Plaintiff and her daughter are in custody for purposes of habeas jurisdiction.

19. The claims against both the government and private defendants arise out of actions taken by Defendants in connection with Plaintiffs' pursuit of a benefit under Title 8, of the United States Code—11 the Immigration and Nationality Act ("INA").

20. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

21. Plaintiff Jane Doe fled her native Honduras to escape the repeated, extreme violence to which she had been subjected by an individual associated with a Honduran police force and the credible threats of violence made against her and her 12-year old daughter, A.M., by a gang associated with and protected by the Honduran government and police force. Upon entering the United States, Plaintiff and her daughter were apprehended and detained by CBP

and forcibly separated. Plaintiff is currently detained at the PIDC in Los Fresnos, Texas. ICE improperly issued a final order of removal against her, and she is in imminent danger of being removed.

22.     The U.S. Department of Homeland Security ("DHS") is an agency of the United States that is charged with implementing the laws passed by Congress. *See* Section 102 of the Homeland Security Act of 2002.  Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant DHS may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to the U.S. Department of Homeland Security, c/o Office of the General Counsel, 245 Murray Lane, SW, Mail Stop 0485, Washington, DC 20528-0485.

23.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the DHS. In this capacity, she directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"). Defendant Nielsen is responsible for the administration of immigration laws and policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the detention of migrant families and the forced separation of families pursuant to the zero-tolerance policy.  Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant Nielsen may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to the The Honorable Kirstjen M. Nielsen, Secretary of Homeland Security, Washington, DC 20528.

24.     The U.S. Citizenship and Immigration Services ("USCIS") is an agency of the U.S., and is a sub-agency to DHS. It is responsible for the adjudication of applications for

benefits under the INA, including the completion of Form I-869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant ICE may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to U.S. Citizenship and Immigration Services, L. Frank Cissna, Director USCIS, 111 Massachusetts Avenue, Headquarters Building, Washington, DC 20529.

25.     The U.S. Immigration and Customs Enforcement ("ICE") is an agency of the U.S., and is a sub-agency to DHS. It is responsible for the administering the nation's immigration system.  ICE is currently detaining Plaintiff. ICE's activities in Southeast Texas are managed from its field office in Houston, Texas.  Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant USCIS may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to U.S. Immigration and Customs Enforcement, c/o Houston ICE Office of Chief Counsel, 126 Northpoint Drive, Room 2020, Houston, TX 77060.

26.     The U.S. Customs and Border Protection ("CBP") is an agency of the U.S., and is a sub-agency to DHS. It is responsible for administering the nation's immigration laws. Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant CBP may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to U.S. Customs and Border Protection, Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection Headquarters, 1300 Pennsylvania Ave., NW, Washington, DC 20229.

27.     Defendant Ronald D. Vitiello is the Deputy Director and Acting Director for U.S. Immigration and Customs Enforcement. In this capacity Defendant Vitiello directs the administration of ICE's detention policies and operations, including those policies and operations regarding the detention of migrant families. Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant Vitiello may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to Ronald D. Vitiello, Deputy Director and Acting Director, U.S. Immigration and Customs Enforcement, 500 12th St., SW, Washington, D.C. 20536.

28.     Defendant Matthew T. Albence is the Executive Associate Director for Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement (ICE). In this capacity, Defendant Albence oversees, directs, and coordinates policies related to ICE's Enforcement and Removal Operations ("ERO"), including those policies and operations regarding the detention and separation of migrant families. Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant Albence may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to Matthew Albence, Executive Associate Director, Enforcement and Removal Operations, U.S Immigration and Customs Enforcement, 500 12th St., SW, Washington, D.C. 20536.

29.     Defendant Brian Manning is an Asylum Officer employed by USCIS in its Houston, Texas field office. In this capacity, Defendant Manning conducted a legally deficient credible fear interview of Plaintiff, and as a result, improperly determined that Plaintiff has no "credible fear" of cognizable harm in Honduras and that Plaintiff is therefore ineligible for

asylum (the "negative credible fear finding"). Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant Manning may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to Brian Manning, c/o USCIS, Houston Asylum Office, P.O. Box 670626, Houston, Texas, 77267.

30.     Defendants John Does are ICE officers who have forcibly separated Plaintiff from her daughter, deprived Plaintiff of her rights to be in contact with her daughter, unreasonably detained Plaintiff, and/or tormented, abused, and lied to Plaintiff during her time in the custody of the United States government. Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant USCIS may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to U.S. Immigration and Customs Enforcement, c/o Houston ICE Office of Chief Counsel, 126 Northpoint Drive, Room 2020, Houston, TX 77060.

31.     Defendants John Does are USCIS officers who have forcibly separated Plaintiff from her daughter, deprived Plaintiff of her rights to be in contact with her daughter, unreasonably detained Plaintiff, and/or tormented, abused, and lied to Plaintiff during her time in the custody of the United States government. Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant ICE may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to U.S. Citizenship and Immigration Services, L. Frank Cissna, Director USCIS, 111 Massachusetts Avenue, Headquarters Building, Washington, DC 20529.

32.     Defendants John Does are CBP officers who have forcibly separated Plaintiff from her daughter, deprived Plaintiff of her rights to be in contact with her daughter, unreasonably detained Plaintiff, and/or tormented, abused, and lied to Plaintiff during her time in the custody of the United States government.  Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant CBP may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to U.S. Customs and Border Protection, Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection Headquarters, 1300 Pennsylvania Ave., NW, Washington, DC 20229.

33.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States. On or about May 7, 2018, Defendant Sessions adopted and/or announced, and now oversees the enforcement of, the "zero tolerance policy," pursuant to which all adults entering the United States illegally are subject to criminal prosecution and are separated from their accompanying minor children.[2] Pursuant to this policy, thousands of migrant children have been separated from their parents, including A.M., Plaintiff's 12-year old daughter. Defendant Sessions further has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiff.  Pursuant to Federal Rules of Civil Procedure 4(i)(1)(A) and 4(i)(2), Defendant Sessions may be served by (i) delivering a copy of the summons and the Complaint to the United States attorney for the Southern District of Texas, and (ii) sending the complaint by registered or certified mail to Jefferson B. Sessions, III, US

---

[2] *See* U.S. Att'y. Gen., Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions (last visited July 11, 2018).

Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

**STATEMENT OF FACTS**[3]

I.    **Plaintiff's history**

    A.    **Persecution and Torture in Honduras**

        1.    **Persecution and Torture by Former Police Officer**

34.    Plaintiff came to the United States from El Negrito Yoro, Honduras, after suffering continuous persecution in her native country of Honduras. Plaintiff traveled to and entered the United States with her 12-year old daughter, A.M. (A.M. is Plaintiff's child with her former common-law husband). Decl. ¶ 1.

35.    For approximately two years before she fled to the United States, Plaintiff dated an individual referred to in this Complaint as "Mr. L." Plaintiff and Mr. L. lived together, but were not married. Mr. L. served on a Honduran police force in a town near El Negrito Yoro. Although he has now left the police force, he maintains close relationships with many officers on the police force in the area, including in El Negrito Yoro. Decl. ¶ 2.

36.    During the course of the relationship, Mr. L. was abusive toward Plaintiff. The abuse escalated in late 2017, when Plaintiff learned that Mr. L. had been unfaithful and she attempted to end the relationship. Decl. ¶ 3.

37.    In response to Plaintiff's attempts to end the relationship, Mr. L. became extremely emotionally and physically abusive to Plaintiff. Mr. L. would hit, punch, and choke

---

[3] The facts in this section are drawn from the Declaration of Jane Doe, attached to and incorporated herein as Exhibit "A" (hereinafter cited as "Decl. ¶ __"). Exhibit "A" contains both the Spanish language original Declaration, an English language, translation and a certificate of translation.

Plaintiff on a regular basis. At one point, Mr. L., inebriated and under the influence of drugs, attempted to stab Plaintiff in the stomach with a screwdriver. Decl. ¶ 4.

38.     Additionally, on approximately six or seven occasions, Mr. L. forcibly raped Plaintiff when she would reject his advances. The situation escalated when Mr. L. choked Plaintiff to the point where she could not breathe. While choking Plaintiff, Mr. L. told Plaintiff that he would kill her. Decl. ¶ 5.

39.     Plaintiff arranged for her daughter, A.M, to stay with her mother to prevent her from witnessing the abuse. Plaintiff was therefore limited to spending time with her daughter during the day. Decl. ¶ 6.

40.     Plaintiff felt unable to seek protection from the police (*e.g.*, by filing a police report) because Mr. L. had previously worked as a police officer in a town near El Negrito Yoro and maintained close relationships with many of the police officers in and around El Negrito Yoro. Plaintiff feared that if she reported the abuse, the police officers would not punish Mr. L., and on the contrary, the police officers would alert Mr. L. that Plaintiff was attempting to report him. Therefore, Plaintiff feared that notifying the police about her abuse at the hands of Mr. L. would only exacerbate her persecution and torture. Decl. ¶ 7.

41.     She also feared that the officers would not take her complaints seriously because she is a divorced single mother, a status which is highly stigmatized in Honduras. Decl. ¶ 8.

> **2.     Persecution by the Maras Gang, which is closely associated with Honduran officials**

42.     Plaintiff owned a small food store in El Negrito Yoro. Decl. ¶ 9.

43.     Single women—or women who are not in relationships with men who will protect them—are very vulnerable in Honduras, particularly when they have children. Gangs often target single mothers that they know are not "protected" by the presence of a man. Decl. ¶ 10.

44.     Mr. L. would often leave for various periods of time throughout his relationship with Plaintiff. During his absences, and after she attempted to end the relationship with Mr. L., incurring his wrath, a gang understood by Plaintiff to be the Maras Gang (the "Maras Gang") regularly threatened and harassed Plaintiff because she was a single and unprotected mother. Decl. ¶ 11.

45.     The Maras Gang began to extort Plaintiff for any money she had available in the store. Decl. ¶ 12.

46.     After taking all her money, the Maras Gang insisted that Plaintiff store guns and drugs in her store for them. Decl. ¶ 13.

47.     When Plaintiff refused, the Maras Gang told Plaintiff that they would kill her and that they knew where her daughter went to school and they would kill her daughter too. Decl. ¶ 14.

48.     Plaintiff did not report the incidents with the Maras Gang to the local police because the gang was known to bribe, pay off, collude with, and receive protection from the police. She therefore reasonably feared that reporting the action would attract the attention of the Maras Gang. Decl. ¶ 15.

**B.      Escape to the United States; Detention and Forced Separation from A.M.**

49.     Facing repeated assaults from Mr. L. and constant and credible threats to her own life and A.M.'s life from both Mr. L. and the Maras Gang, Plaintiff fled with her daughter from Honduras on or about May 20,˙ 2018. (Plaintiff considered fleeing to another city in Honduras, but decided to leave Honduras altogether due to the wide reach of the Maras Gang in the country.) Decl. ¶ 16.

50.     Plaintiff and her daughter crossed through Guatemala and Mexico by bus. She arrived in McAllen on or about June 8, 2018, after crossing the Rio Grande. Within a few

minutes of crossing the border, Plaintiff and her daughter surrendered to CBP and were taken to one of the initial intake processing centers operated by Defendants, known as a *hielera* ("Ice Box") for its frigid temperatures. Decl. ¶ 17.

51.     The guards forcibly separated Plaintiff from her daughter in the Ice Box, and told Plaintiff that she should have not come to the country with her child. When they realized they were going to be separated, A.M. and Plaintiff screamed and begged the officers to keep them together. However, Defendants John Doe forcibly separated Plaintiff and A.M. Decl. ¶ 18.

52.     During her time in the Ice Box, Plaintiff was repeatedly yelled at and threatened by detention officers who told her that she would be punished for coming to the country illegally. Decl. ¶ 19.

53.     Specifically, Plaintiff was told that she would be deported by herself, *while her daughter would remain in the United States without her.* Decl. ¶ 20.

54.     At the time of separation, detention officers told Plaintiff that she would be able to see her daughter again in 48 hours—but this was a lie. Plaintiff has not seen her daughter even once since they were forcibly separated. Decl. ¶ 21.

55.     Plaintiff was then taken to an immigration detention facility, known as *La Perrera* (the "Dog Cage"), because of its resemblance to a dog kennel. Decl. ¶ 22.

56.     Knowing that some children were detained in the Dog Cage and hoping that her daughter was close by, Plaintiff, sobbing hysterically, repeatedly asked CBP officers to give her "five minutes" with her child to let her know that everything would be OK. Decl. ¶ 23.

57.     In response, the guards screamed at Plaintiff to be quiet, again yelled at her about coming into the country "illegally" and threatened that she would be deported without her child

as punishment for her actions. They did not reunite Plaintiff with A.M., who was sent thousands of miles away to a child detention facility in Florida. Decl. ¶ 24.

58.     After three days in the Dog Cage, Plaintiff was taken to the federal courthouse in Brownsville, Texas, on June 9, 2018, where she appeared before a Magistrate Judge concerning an alleged violation of Title 8, United States Code, Section 1325(a)(1). Decl. ¶ 25. Under extreme emotional distress, hopeful for a speedy reunion with A.M., and not fully understanding the ramifications—Plaintiff pled guilty to the charge.

59.     At the courthouse, ICE Officers promised Plaintiff that she would be reunited with her daughter at PIDC. Decl. ¶ 26.

60.     Plaintiff's newfound sense of hope quickly descended into further grief as Plaintiff realized that the officer lied to her, and she was detained in the PIDC without any contact with her daughter for ten days. Decl. ¶ 27.

61.     After ten long days of detention with no knowledge of her daughter's whereabouts, Plaintiff was finally permitted to speak with her daughter over the phone for a brief time. She has since been allowed only a few calls. These calls have been her only contact with A.M. during her detention—which has lasted nearly a month so far. Decl. ¶ 28.

62.     During that first call, Plaintiff's daughter A.M. cried unceasingly. She was grief-stricken and terrified, and asked repeatedly when she would be able to see Plaintiff again. Decl. ¶ 29.

63.     A.M.'s social worker mentioned to Plaintiff that A.M. was so depressed during her confinement that she had arranged for a therapist to assist A.M. in managing her trauma. Decl. ¶ 30.

64.     Throughout her confinement and separation from her daughter, Plaintiff has felt extremely depressed and wracked with fear over the long-lasting damage that is being done to her daughter as a result of the Defendants' actions. Decl. ¶ 31.

**C.     Credible Fear Interview**

65.     After Plaintiff expressed a fear of returning to Honduras, an official conducted a telephonic Credible Fear Interview ("CFI") on June 25, 2018. Decl. ¶ 32.

66.     By this time, Plaintiff had been detained at the PIDC for over two weeks without her daughter A.M. For a majority of that time, Plaintiff had no information regarding the whereabouts of her daughter or if her daughter was safe which caused Plaintiff to not sleep or eat for days. Plaintiff was only allowed to speak to A.M. once four days prior to the CFI. That conversation only exacerbated her depression and mental state because A.M. was terrified and despairing to the point that she had been placed under the care of a therapist. The therapist informed Plaintiff that A.M. cried continuously for days upon separation from the Plaintiff. Decl. ¶ 33.

67.     The CFI was conducted by Defendant Manning and an interpreter via telephone. Defendant Manning did not explain the procedure regarding how the CFI would be conducted. Decl. ¶ 34.

68.     Because of inconsistencies in the paperwork that was created to document the CFI, it is unclear how long the CFI lasted. (The paperwork reflects that the interview ended before it began.) However, Plaintiff recollects that she spent less than thirty minutes answering questions. Decl. ¶ 35.

69.     While Defendant Manning did ask Plaintiff if she was taking any medication or if Plaintiff had any health issues that may affect her ability to answer questions, Defendant Manning never inquired as to the Plaintiff's state of mind. If asked, Plaintiff would have

responded that she was depressed, traumatized, fearful, and, unquestionably, not in any mental state to answer questions regarding her traumatic persecution and torture in Honduras. Decl. ¶ 36.

70.     Further, Defendant Manning informed Plaintiff that she was only to answer the questions she was asked and that she was not permitted to expand or elaborate on her answers beyond the questions asked. Decl. ¶ 37.

71.     Throughout the CFI, Plaintiff reports that she would attempt to limit her answers so as not to upset Defendant Manning. After Plaintiff would respond to Defendant Manning's question, Defendant Manning would restate her answer but often misstated what she had said. However, she feared correcting him. Decl. ¶ 38.

72.     As Plaintiff was under extreme duress during the CFI, Plaintiff does not have a clear recollection of all the questions that were posed nor how she answered those questions. Decl. ¶ 39.

**D.     Denial of Credible Fear Interview**

73.     A mere two days later on June 27, 2018, Plaintiff was informed, again via telephone, that Defendant Manning had determined that Plaintiff had not established a credible fear of persecution and that her CFI had been denied (the "negative credible fear finding"). Decl. ¶ 40.

74.     At that time, Plaintiff had still only been allowed to speak to her daughter once. Plaintiff was exhausted, depressed, and most of all, fearful that she would be deported to Honduras without her daughter. Plaintiff had witnessed on several occasions where mothers who had received a denial to their CFIs would be deported in the early morning hours without their children. Decl. ¶ 41.

75.    Defendant Manning asked Plaintiff if she wanted to appeal the negative credible fear finding. Because Plaintiff feared she would be deported without her daughter and because Defendant Manning did not explain the ramifications of declining the right to appeal, Plaintiff orally responded that she did not want to appeal the negative credible fear finding. Again, Plaintiff was not provided any explanation regarding the potential ramifications of the negative credible fear finding or of a decision to waive review of the finding by an immigration judge. Decl. ¶ 42.

76.    Upon returning to her cell, Plaintiff was informed by other detained mothers of the repercussions of choosing to not appeal the negative credible fear finding. Plaintiff did not understand that by not requesting the appeal, Plaintiff would be returned to Honduras where her persecution and torture, and possible death would be imminent. Decl. ¶ 43.

77.    About an hour after she had orally declined to appeal the negative credible fear finding, Plaintiff wrote a note requesting that the negative credible fear finding by reviewed by an immigration judge. She put the note in a letter addressed to "ICE" and, at the direction of ICE guards, placed the envelope in an onsite mailbox established to transmit communications to ICE officials. Decl. ¶ 44.

78.    The following day on June 28, 2018, a PIDC official, who is known to be rude and abrasive with the detainees, told Plaintiff to sign a one-page document that was in English (now known to be the "Record of Negative Credible Fear Finding and Request for Review by Immigration Judge"). The PIDC official pointed with his finger where he wanted Plaintiff to mark (which, unbeknownst to Plaintiff, was the option not to appeal the negative credible fear finding). Plaintiff, intimidated by the PIDC official who regularly screamed at detainees and

threatened to report detainees who did not sign upon request, signed the English language document. Decl. ¶ 45.

79.     At no point was the document translated into Spanish, Plaintiff's native language, nor did the PIDC official explain to Plaintiff the ramifications of signing the document. Decl. ¶ 46.

80.     In fact, Plaintiff was shocked to learn that a deportation order had been entered against her, and that ICE officials were in the process of deporting her to Honduras. Plaintiff believed that by giving the note to the PIDC official, she had preserved her right to appeal the negative credible fear finding. Decl. ¶ 47.

81.     That Plaintiff's removal to Honduras was imminent was confirmed by PIDC detention Officer Quintera, whom counsel in this case contacted on July 5, 2018, in the context of this firm's representation of Plaintiff. *See* Declaration of John Brent Beckert, attached to and incorporated herein as Exhibit "B," at ¶¶ 8–15. Officer Quintera stated that "Plaintiff was subject to a Final Order of Expedited Removal and would be promptly deported after receiving a negative finding in her credible fear interview." *Id.* at ¶ 10.

**E.     Deficiencies in Credible Fear Records**

82.     Upon review of the CFI record, it is clear that the CFI was conducted hastily, and with no intent to genuinely access Plaintiff's fear of persecution. This is evident by the numerous errors and inconsistencies throughout the CFI Record. *See* Credible Fear Record, Exhibit 1 to the Declaration of John Brent Beckert (hereinafter "CFI Record"). These errors include:

        a.     The time of the CFI interview is noted as starting at 12:28 and ending at 12:23. *See* CFI Record at 3, Record of Determination/Credible Fear Worksheet. Because of this, it is impossible to determine how long the CFI interview lasted.

b. The CFI Record notes that Plaintiff is "Single," when in fact Plaintiff is "Separated" from her common-law husband. *See id*. at 4, Biographic Information, Section 2.13.

c. The CFI Record notes that Plaintiff does not have Children. *See id.*, Section 2.17.

d. The CFI Record further notes that she does have one daughter; however, the Record notes that her daughter did not "arrive with [Parent]."[4] *See id.*, Section 2.18.

83. Despite the hasty nature of the interview, the Asylum Officer nonetheless noted that Plaintiff was "found credible" when explaining her story of persecution. *See id*. at 6, Section 4.1.

## II. Statutory and Regulatory Framework

84. Under the INA, a foreign national apprehended shortly after entering the United States without valid documentation is initially subject to a streamlined removal process dubbed "expedited removal." *See* 8 U.S.C. § 1225(b)(1)(A)(i)–(iii); 69 Fed. Reg. 48,877 (Aug. 11, 2004). If, however, she can demonstrate a "credible fear" of persecution in her home country during the initial screening, *see id*. § 1225(b)(1)(A)–(B); 8 C.F.R.§ 208.30(d)–(g), she is transferred to "standard" removal proceedings pursuant to 8 U.S.C. § 1229a. Once reclassified, the foreign national is entitled to a full asylum hearing before an immigration court, and, if unsuccessful, she may file an administrative appeal with the Board of Immigration Appeals (BIA). *See* 8 C.F.R. § 208.30(f); 8 U.S.C. § 1225(b)(1)(B)(ii). She may also petition for review of any removal order entered against her in the appropriate court of appeals. *See* 8 U.S.C. § 1252(a)–(b).

---

[4] *See id.*, Section 2.18.

**III.    Plaintiff's situation is the result of policies and practices promoted by the White House and adopted and implemented by Defendants.**

    **A.    The White House and others in the current administration have announced their intention to deter immigrants and asylum seekers from entering the United States and to remove them as quickly as possible, "with no Judges or Court Cases," if they enter.**

85.    The White House and the current administration have repeatedly expressed their intention to curb immigration to the United States. To do so, they have proposed (among other things) that immigrants and asylum seekers be removed from the country as quickly as possible and "with no Judges or Court Cases," *i.e.*, without any semblance of due process.

86.    For example, in a public speech in May 2018, President Donald J. Trump noted that "We have people coming into the country, or trying to come in—and we're stopping a lot of them—but we're taking people out of the country. You wouldn't believe how bad these people are. These aren't people. These are animals. And we're taking them out of the country at a level and at a rate that's never happened before."[5]

87.    President Trump was more explicit in a series of tweets posted in June 2018, where he wrote that:

- "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came. Our system is a mockery to good immigration policy and Law and Order."[6]

- "When people come into our Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering. Our laws are the dumbest anywhere in the world."[7]

---

[5] *See* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-california-sanctuary-state-roundtable/ (last visited July 11, 2018).

[6] *See* https://twitter.com/realdonaldtrump/status/1010900865602019329?lang=en (last visited July 11, 2018).

[7] *See* https://twitter.com/realdonaldtrump/status/1013146187510243328?lang=en (last visited July 11, 2018).

- "When people, with or without children, enter our Country, they must be told to leave without our .....Country being forced to endure a long and costly trial. Tell the people "OUT," and they must leave, just as they would if they were standing on your front lawn. Hiring thousands of "judges" does not work and is not acceptable - only Country in the World that does this!"[8]

(All-caps in original.)

88.     Members of the current administration also expressed support for using forced family separations to curb immigration. For example, the DHS released a statement in March 2017 noting that it "continually explores options," including forced family separation, that "may discourage [immigrants and asylum seekers] from even beginning the journey" to the United States.

**B.     The Attorney General adopted the "zero tolerance policy," which the other Defendants implemented, to accomplish the current administration's goals of deterring immigrants and asylum seekers from entering the United States.**

89.     On May 7, 2018, the Attorney General of the United States announced a "zero tolerance policy," under which all adults entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be separated from the parent.[9] There have been widespread reports that the "zero tolerance policy" was also applied to asylum seekers.

90.     Over the ensuing weeks, hundreds of migrant children were separated from their parents. The Government was not prepared to accommodate the mass influx of separated

---

[8] *See* https://twitter.com/realdonaldtrump/status/1014873774003556354; https://twitter.com/realDonaldTrump/status/1014875575557804034?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1014875575557804034&ref_url=https%3A%2F%2Ftimesofindia.indiatimes.com%2Fworld%2Fus%2Fdonald-trump-calls-on-congress-to-fix-insane-immigration-laws%2Farticleshow%2F64873642.cms (last visited July 11, 2018).
[9] *See* U.S. Att'y. Gen., Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions (last visited July 11, 2018).

children. Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children. Some parents have been removed at separate times and from different locations than their children.

91.     It is clear that the current administration's intention in adopting this policy is not to protect children, but rather to create a public spectacle designed to deter immigrants and asylum seekers from entering the United States. When questioned about the crisis caused by forced family separations during a press conference held on July 10, 2018, the President explained that "I have a solution. Tell people not to come to our country illegally. That's the solution. Don't come to our country illegally. Come like other people do. Come legally. I'm saying this very simply: We have laws. We have borders. Don't come to our country illegally. It's not a good thing." *See* Louis Nelson, *Trump's solution for reunifying migrant families: 'Don't come to our country illegally'*, Politico (July 10, 2018) *available at* https://www.politico.com/story/2018/07/10/trump-migrant-families-separated-706144 (last visited July 10, 2018).

**C.      Defendants have adopted and implemented policies and practices designed to accomplish the President's goals of removing immigrants and asylum seekers from the United States as quickly as possible, "with no Judges or Court Cases."**

92.     Defendants have adopted and implemented policies and practices to effectuate the White House's and the current administration's desire to deport immigrants and asylum seekers without access to "Judges or Court Cases."

93.     Emerging reports suggest that immigration officials, including Defendants, are using the children taken from their parents as leverage to coerce parents into withdrawing their asylum claims. For example, the family reunification Fact Sheet released by DHS on June 23,

2018, provides for family reunification only for adults "who are subject to removal" so that they may be "reunited with their children for the purposes of removal." *See* Fact Sheet: Zero-Tolerance Prosecution and Family Reunification (June 23, 2018) *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/1f98ad8 (last visited July 11, 2018). Put another way, parents who hope to be quickly reunited with their children must abandon their own asylum claims their children's claims. *See* Dara Lind*, Trump will reunite separated families – but only if they agree to deportation*, Vox (June 25, 2018) *available at* https://www.vox.com/2018/6/25/17484042/children-parents-separate-reunite-plan-trump (last visited July 11, 2018).

94.     This policy has been effective. On June 24, 2018, a DHS official tweeted that parents separated from their children "were quickly given the option to sign paperwork leading to their deportation. Many chose to do so." *See* https://twitter.com/jacobsoboroff/status/1010862 394103328771 (last visited July 11, 2018). This is consistent with other accounts of parents signing voluntary deportation paperwork out of "desperation" because officials had suggested that it would lead to faster reunification with their children. *See, e.g*., Jay Root and Shannon Najmabadi, *Kids in exchange for deportation: Detained migrants say they were told they could get kids back on way out of U.S.*, Texas Tribune (June 24, 2018) *available at* https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/?utm_campaign=trib-social-buttons&utm_source=twitter&utm_medium=social (last visited July 11, 2018).

95.     Likewise, on June 24, 2018, a senior administrative official speaking on the condition of anonymity confirmed that defendants do not plan to reunite families until after a parent has lost his or her deportation case, effectively punishing parents who may otherwise

pursue an asylum claim or other relief request and creating tremendous pressure to abandon such claims so that parents may be reunited with kids. *See* Maria Saccherri, Michael Miller and Robert Moore, *Sen. Warren visits detention center, says no children being returned to parents there*, The Washington Post (June 24, 2018) *available at* https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html (last visited July11, 2018).

96.     These policies and practices—including forced family separation, harsh detention, abuse, intimidation, threats to family reunification, and legally deficient asylum processing—were used against Plaintiff.[10] As set forth herein, Plaintiff has been forcibly separated from her minor daughter by Defendants for nearly a month (despite the fact that Defendants created records falsely stating that A.M. did *not* "Arrive with [Plaintiff]); has been threatened with permanent separation from A.M.; has been harassed, abused, and humiliated by Defendants; was subjected to a slapdash, legally deficient CFI; and has been intimidated into signing English-language documents that she cannot read and does not understand the import of (including its impact on her asylum claims).

---

[10] Seventeen states and the District of Columbia have filed a lawsuit against the Trump administration to enjoin the practice of forced family separations. *See, State of Washington v. Donald Trump*, 2:18-cv-00939-MJP, currently pending in the United States District Court for the Western District of Washington at Seattle. The states recently submitted a Motion for Expedited Discovery and Regular Status Conferences (Dkt. 15) which is supported by detailed affidavits by parents who have been forcibly separated from their children and by lawyers who represent the parents and the children. This testimony is replete with accounts of agents using abuse and intimidation which the agents allegedly admit is a means to deter immigrants and asylum seekers.

# CAUSES OF ACTION

## COUNT 1 – VIOLATION OF FIFTH AMENDMENT DUE PROCESS RIGHTS

97.     All of the foregoing allegations are repeated and realleged as through fully set forth herein.

98.     At all times relevant to this litigation, Defendants have been acting under the color of the laws of the United States.

99.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Plaintiff and her daughter.

100.    Plaintiff has a liberty interest under the Due Process Clause in remaining together as a family with her minor daughter, A.M.

101.    Plaintiff has a liberty interest in being free from arbitrary prolonged detention, unnecessary physical restraints, and harsh and prison-like conditions with emotionally abusive prison officers.

102.    The interests set forth in the foregoing paragraphs are fundamental rights and are protected by substantive due process under the Fifth Amendment of the United States Constitution.

103.    Plaintiff also has a property and liberty interest in her right to petition for political asylum and/or CAT withholding of removal.

104.    Plaintiff is also entitled to some procedural protections under the Due Process Clause.

105.    But Defendants have violated Plaintiff's Due Process rights pursuant to Defendants' policies (including without limitation their "zero tolerance policy"), patterns and practices as follows:

a. Defendants have ripped apart Plaintiff's family by forcibly and arbitrarily separating her from her minor daughter, A.M., without justification and for a prolonged period of time.

b. Defendants are subjecting Plaintiff to arbitrary and prolonged detention in harsh and prison-like conditions, without any adequate justification therefor.

c. Defendants are punishing the Plaintiffs for seeking asylum in the United States, in accordance with the policies put forth in the public statements made by President Trump and other members of his administration, including Defendants.

d. Defendants are denying Plaintiff her right to a legally sufficient CFI and a properly-requested hearing before an immigration judge.

106. Such violations have caused and are causing mental and physical harms to the Plaintiff and her daughter, and have hampered Plaintiff's access to justice.

107. Plaintiff seeks declaratory and injunctive relief against the Defendants in their official capacities.

108. Plaintiff brings this constitutional claim against Defendants in their official capacities.

### COUNT 2 – VIOLATION OF THE RIGHT TO PETITION

109. All of the foregoing allegations are repeated and realleged as through fully set forth herein.

110. At all times relevant to this litigation, Defendants have been acting under the color of the laws of the United States.

111.     Plaintiff has a combined First and Fifth Amendment right to petition the United States government for asylum under 8 U.S.C. §§ 1158(a)(1) and 1225 and/or withholding of removal under the Convention Against Torture.

112.     Plaintiff also has a First and Fifth Amendment right to be free of retaliation, penalties, deterrence, or chilling effects in seeking asylum and/or withholding remedies.

113.     As set forth herein, Defendants have violated the Plaintiffs' First and Fifth Amendment rights by, *inter alia*, improperly subjecting her to a legally deficient CFI, trying to prevent her from seeking review by an immigration judge of the negative credible fear finding by Defendant Manning and using her forced separation from her daughter as leverage to try to force her to abandon her asylum claim.

114.     Plaintiff has suffered and continues to suffer mental and physical harm, and to be unduly hampered in obtaining counsel and participating in the proper preparation of her case, as a result of the Defendants' actions.

115.     Defendants have no adequate justification for such violations of the Plaintiff's rights.

116.     Plaintiff seeks declaratory and injunctive relief pursuant to the First and Fifth Amendments of the United States Constitution.

117.     Plaintiff brings this constitutional claim against Defendants in their official capacities.

118.     All of the foregoing allegations are repeated and realleged as through fully set forth herein.

119.     At all times relevant to this litigation, Defendants were acting under the color of the laws of the United States.

120.     The Department of Homeland Security, the U.S. Immigration and Customs Enforcement, and the Department of Justice are United States agencies, and all Defendants are officials of those agencies.

121.     Defendants' final removal order is a final agency action.

122.     The Refugee Protocol was ratified by the United States government, and incorporated into U.S. domestic law. *See* Refugee Protocol: 8 U.S.C. § 1101 *et. seq.*

123.     The Convention Against Torture has likewise been ratified and incorporated into U.S. domestic law. *See* Convention Against Torture: 8 CFR 208.18.

124.     These treaties and statutes are designed to protect victims of persecution and to prevent them from being returned to any region where they are at risk of persecution and/or torture.

125.     Plaintiff's right to seek asylum and/or withholding of removal, and to be free of removal to any region where they face persecution and/or torture, fall within the zone of interests expressly protected by these statutes and treaties.

126.     Defendants' "zero tolerance policy" is final and binding agency action.

127.     Defendants have violated the Administrative Procedure Act as set forth herein, including:

a. Pursuant to policy and practice, Defendants have deprived Plaintiff of the ability to demonstrate that she has a credible fear of persecution or torture in violation of the APA. Defendants have willfully and unreasonably deprived Plaintiff of an opportunity to establish a credible fear of persecution of torture necessary to apply for asylum under United States immigration law.

b. The CFI that Plaintiff was provided was defective because, *inter alia*, Plaintiff did not understand the process sufficiently and because the officer did not give Plaintiff an opportunity to explain the bases for her asylum claim. Accordingly, the CFI violates 8 C.F.R. § 208.30(d).

c. Furthermore, Plaintiff was denied the opportunity to have an immigration judge review the asylum officer's adverse credible fear finding. Plaintiff requested review by an immigration judge, which has not been honored. This failure to provide Plaintiff with the requested review violates 8 C.F.R. § 1208.

128. Plaintiff has suffered physical and emotional harm as a result of the Defendants' unlawful actions and continues to suffer such harms at this time.

129. Plaintiff has been and still is seriously hampered in preparing her legal case.

130. Plaintiff seeks injunctive relief against the Defendants pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 *et. seq.*

131. Plaintiff brings this claim against the Defendants in their official capacities.

## COUNT 4 – HABEAS CORPUS

132. All of the foregoing allegations are repeated and realleged as through fully set forth herein.

133.    Plaintiff is currently in custody and her property and liberty rights have been violated.

134.    Defendants failed to lawfully apply the INA and implementing regulations to Plaintiff's detention. In seeking to determine whether Plaintiff demonstrated a credible fear of persecution, Defendants failed to "elicit all relevant and useful information bearing on the applicant's eligibility for asylum," 8 C.F.R. § 1208.9. Further, Defendant's deceptive actions in attempting to obtain a waiver of review deprived Plaintiff of her administrative appeal rights. 8 C.F.R. § 1208; *see Am-Arab Anti-Discrimination Comm. v. Ashcroft*, 272 F. Supp. 2d 650, 662–63 (E.D. Mich. 2003) (reviewing whether asylum statute lawfully applied).

135.    Defendants' execution of the CFI and expedited removal process, placing Plaintiff under extreme duress and neglecting Defendants' obligation to ensure an applicant's understanding of the asylum and expedited removal process, violated international treaties and domestic law, as well as Plaintiff's right to Due Process.

136.    Defendant's actions during Plaintiff's detention have deprived Plaintiff of her regulatory, statutory and constitutional rights, giving rise to her cause of action in habeas corpus.

137.    Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. § 2241.

## PRAYER

WHEREFORE, Plaintiff prays that the Court:

1.    Compel Defendants to reunite Plaintiff with her daughter forthwith;[11]

2.    Compel Defendants to conduct a credible fear interview that complies with the requirements set out in the APA after Plaintiff and her daughter have been reunited and have had time to readjust; and

---

[11] *See Ms. L. v. U.S. Immigration & Customs Enforcement*, 18-cv-0428 DMS (MDD), Order Granting Plaintiffs' Motion for Classwide Preliminary Injunction, dated June 26, 2018.

3. Compel Defendants to allow a full review of any negative credible fear interview by an immigration judge; and

4. Grant any other and further relief as this Court deems proper under the circumstances.

HAYNES AND BOONE, LLP

By: */s/ Leslie C. Thorne*
    Leslie C. Thorne
    SDTX No. 618384
    State Bar No. 24046974
    Emily Westridge Black*
    State Bar No.: 24060815
    Wesley D. Lewis*
    State Bar No.: 24106204
    600 Congress Avenue, Suite 1300
    Austin, Texas 78701
    Telephone: (512) 867-8422
    Facsimile: (512) 867-8605
    emily.westridgeblack@haynesboone.com
    leslie.thorne@haynesboone.com
    wesley.lewis@haynesboone.com

    Pierre Grosdidier
    SDTX No. 893533
    State Bar No. 24059866
    1221 McKinney Street, Suite 2100
    Houston, Texas 77010
    Telephone: 713.547.2272
    Telecopier: 713.547.2600
    pierre.grosdidier@haynesboone.com

    Luis Campos*
    State Bar No.: 00787196
    Carla Green*
    State Bar No.: 24097762
    John Brent Beckert*
    State Bar No.: 24092104
    2323 Victory Avenue, Suite 700
    Dallas, Texas 75219
    Telephone: (214) 651-5062
    Facsimile: (214) 200-0789
    luis.campos@haynesboone.com
    carla.green@haynesboone.com
    brent.beckert@haynesboone.com

ATTORNEYS FOR PLAINTIFF JANE DOE

* *Pro hac vice* motions to be filed.

## VERIFICATION BY SOMEONE ACTING ON PLAINTIFF'S BEHALF
## PURSUANT TO 28 U.S.C. § 2242

I am submitting this verification on behalf of the Petitioner because I am one of Plaintiff's attorneys. I have discussed with Plaintiff the events described in this Petition for Habeas Corpus and Complaint. On the basis of those discussions, I hereby verify that the statements made herein are true and correct to the best of my knowledge.

Dated:        July 11, 2018

                                        */S/ Carla Green*_____
                                        Carla Green
                                        Attorney for Petitioner